**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

BRANCH BANKING & TRUST COMPANY,
          *Plaintiff*,

v.                                         Case No.: 3:10cv055

CARL J. WITMEYER, II,
          *Defendant*.

## <u>MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

      COMES NOW Carl J. Witmeyer, II, by counsel, and for his Memorandum in Opposition to Motion for Summary Judgment in the captioned case states as follows:

### I.      <u>Introduction.</u>

      Branch Banking & Trust ("BB&T") has moved for summary judgment  (the "Motion") against Defendant and Counterclaim Plaintiff Carl J. Witmeyer, II ("Witmeyer") in the captioned case.  Reduced to its essence, BB&T's Motion depends on BB&T's contention that it was perfectly free to misrepresent to Witmeyer that the Citibank "Official Check" (the "Check") Witmeyer deposited into his IOLTA trust account on June 2, 2009 had cleared on June 4, 2009 when in fact it had not.  BB&T's position is that once Witmeyer deposited the Check, Virginia's Uniform Commercial Code ("UCC") gave BB&T <u>carte</u> <u>blanche</u> to treat him in whatever fashion it chose (short of lying to him) and left him without remedy of any sort.  Fortunately for customers like Witmeyer, however, nothing in the UCC gives banks the right to make material misstatements of fact to their customers, violate established policies and procedures and industry standards to their customers' detriment, or intentionally destroy evidence bearing on their accountability.

## II.    Disputed Facts.

Much of BB&T's factual recitation is accurate. Where, however, the facts most matter,

BB&T's narrative is deficient.  Witmeyer disputes the following facts set forth by BB&T.

1.    BB&T recites, as an "undisputed material fact" that "[a]s a matter of law,

Witmeyer had notice on June 4, 2009, that Citibank's midnight deadline to either pay or return

the [Check] had not yet passed at the time he wired the funds to BECALM in Japan.  See Va.

Code Ann. §8.4-302(a)."  BB&T's Memorandum in Support of Motion for Summary Judgment

("BB&T Memo") at 6.  BB&T suggests, with this assertion, that every consumer who transacts

business with BB&T is charged conclusively with complete knowledge and understanding of

each and every provision of the UCC.  BB&T provides no citation to bolster this absurd legal

proposition, which in any event, is not a "fact" but an incorrect conclusion of law.  See Va. Code

Ann. §8.1A-202 (a person has "notice" of a fact under UCC when he has "actual knowledge" or

when he "has received a notice or notification" or "from all the facts and circumstances known to

the person at the time in question, [he] has reason to know it exists.").

2.    BB&T contends that "Citibank provided written confirmation of the return [of

the Check] on June 5, 2009, time stamped 6:28 p.m."  BB&T Memo at 6.  BB&T's support for

this assertion, however, does not indicate anything of the kind.  See BB&T Summary Judgment

Exhibit 12.  BB&T's Summary Judgment Exhibit 12, which is not verified or explained by

affidavit or deposition testimony, is a single-page document consisting of two e-mails.  BB&T's

Memo claims that the earlier of the two, dated June 5, 2009 at 6:28 p.m., is Citibank's "written

confirmation" of the Check's return.  The e-mail's sender is listed as "Washington, Jamar" and

its recipient is "CENTRAL VIRGINIA REGION AOO HUB."  In this communication, Mr.

Washington instructs the recipient to "contact LRM" at a telephone number in Charlotte, North Carolina (704-954-3677) with "questions regarding holds" and a number in Wilson, North Carolina (252-246-3153) with "any other questions . . . . "  BB&T Exhibit 12.  These phone numbers belong to BB&T.  "LRM is BB&T's fraud detection unit.  See Deposition of Brenda Street attached hereto with its exhibit 2 as Witmeyer Exhibit A; Exhibit 2 thereto (BB&T's "Hold Policy") at BB&T 047 (defining BB&T's Liability Risk Management unit as "LRM" and its Area Operations Office as "AOO").  Under BB&T's procedures, after it receives notice from another bank that a check is being returned, BB&T's "Returns Department will notify Liability Risk Management (LRM) and the branch contact by e-mail . . . .  For deposit items, the Area Operations Officer (AOO) will be responsible for reviewing the account to determine if Liability Risk Management (LRM) has placed a hold."  Id.

BB&T's Hold Policy makes clear that BB&T's Summary Judgment Exhibit 12 is not a notification from Citibank.  Although BB&T produced this document in discovery as being a communication between Citibank and BB&T, (See Branch Banking and Trust Company's Objections and Supplemental Responses to Defendant's First Request for Production of Documents ("BB&T Document Responses"), attached hereto as Exhibit B, at Response to Request no. 9) it in fact is an internal BB&T communication. All it establishes is that no later than June 5, 2009 at 6:28 p.m. BB&T knew the Check was a counterfeit.  It does not address when Citibank notified BB&T of that fact.  Logically, however, the notice had to occur prior to that time.

BB&T's misrepresentation of the provenance of its Summary Judgment Exhibit 12 suggests that it in fact knew the Check was a counterfeit earlier than June 5 at 6:28 p.m. BB&T's only other "communication" with Citibank, according to its discovery responses, is

contained in BB&T 041, which includes a copy of the Check stamped "COUNTERFEIT" and dated "06/04/2009." See BB&T 041 attached hereto as Witmeyer Exhibit C. This document indicates that Citibank communicated to BB&T that the Check was counterfeit on June 4, 2009. That timing is consistent with BB&T's admission that Citibank was obligated either to pay or return the Check no later than "midnight, June 4, 2009." BB&T's Objections and Supplemental Responses to Defendant's First Requests for Admissions ("BB&T Admissions"), attached hereto as Exhibit D, at 5-6 (Response to Request No. 14). Upon discovering BB&T's misrepresentation, Witmeyer issued a Subpoena to Citibank to determine the truth regarding when BB&T became aware the Check was a counterfeit. That subpoena is returnable on October 11, 2010.

   3.  BB&T recites that "there was nothing about [the Check] that stood out as unusual and that it "looked like a regular cashier's check or official check . . . . " BB&T Memo at 4 (citing BB&T Exhibit 8, Williamson transcript at 30, lines 10-23); BB&T Exhibit 13, Affidavit of Lisa Thrift, paragraph 4. Williamson's statement that the Check was not unusual to her is beside the point. BB&T emphasizes its teller Lisa Thrift's statement that the Check was not obviously a counterfeit in her 22 years of experience as a teller, during which she has handled "thousands upon thousands of deposit-related transactions . . . . " Lisa Thrift Affidavit at paragraph 4. BB&T's actions, however, have prevented Witmeyer from testing the legitimacy of Ms. Thrift's contentions regarding the Check. BB&T admits that it destroyed the original of the Check after it knew that Citibank had refused payment because it was a counterfeit. See BB&T's Objections and Supplemental Response to Defendant's First Set of Interrogatories ("BB&T's Interrogatory Answers"), attached hereto as Witmeyer Exhibit E, at Response to Interrogatory 3; BB&T Admissions, at Response to Request No. 22. BB&T's spoliation of this

evidence has prevented Witmeyer from engaging an independent expert to evaluate the

legitimacy of Ms. Thrift's contention.  See Affidavit of Charles L. Williams and Exhibit 1

thereto ("Williams Report"), attached hereto as Witmeyer Exhibit F, at 34-35, 38.  Accordingly,

Witmeyer is entitled to an inference that the original of the Check would reveal to a trained teller

indices of fraud.  See Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155-56 (4th Cir. 1995).

### III.    Additional Undisputed Facts Necessary to Prevent BB&T's Factual Recitation from Begin Seriously Misleading.

1.      BB&T's recitation of undisputed material facts omits entirely any mention of

Witmeyer's uncontroverted deposition testimony concerning his interaction with BB&T

employee Brenda Street.  Witmeyer testified that when he went to BB&T on June 4, after being

told by his bookkeeper that the funds represented by the Check were available for purposes of

accomplishing the wire transfer, "when I sat down, I said, I understand from Becky

[Williamson], my bookkeeper, that the Check had cleared and the funds were available to be

transferred.  And she said, let me check and I was across the desk from her, so I don't know what

she did, but she said, that's true."  Witmeyer Deposition, attached hereto as Witmeyer Exhibit G,

at 34, lines 19-23; 35, lines 1-2.  Brenda Street, when questioned about this exchange, testified

that she could not remember, one way or the other, whether it occurred.  Brenda Street

deposition at 26, lines 12-23; 27, lines 1-4.

2.      BB&T's misrepresentation to Witmeyer is central to the resolution of this case

because Witmeyer would not have authorized the wire transfer of over $200,000.00 on June 4 if

the actual status of the Check had been communicated to him.  Affidavit of Carl J. Witmeyer, II

("Witmeyer Affidavit") attached hereto as Witmeyer Exhibit H, at paragraph 9.  Likewise,

BB&T would not have wired out over $200,000.00 if the Check had not been deposited to

Witmeyer's account.  BB&T Admissions, Response to Admission Nos. 4, 5. Witmeyer was

relying on BB&T to provide information to him.  BB&T undertook to do so.  Unfortunately, that information was inaccurate.  Witmeyer was in no hurry to effect the wire transfer and had no need to do so prior to the Check being paid.  <u>See</u> Witmeyer Affidavit, paragraph 17.  If he had not been told the check had cleared, he would not have authorized BB&T to make the wire transfer from his IOLTA account.  Witmeyer Affidavit, paragraph 9.  Indeed, he had no expectation that, when BB&T approved the wire transfer it was, in effect, making him an unrequested and undesired loan, which he was in turn loaning to his client by making the wire transfer.  If he had understood the transaction in that way, he would not have undertaken it because he believes it would have been unethical for him to do so.  <u>See</u> Witmeyer Affidavit, paragraph 9; <u>see</u> Virginia Rules of Professional Conduct, Rule 1.8(a) Rule 1.15(c).  The peculiarities of attorney escrow account responsibilities turned to chaos a situation that would have been bad enough in a regular deposit account.  "Provisional" credit was, contrary to BB&T's assertion (<u>see</u> BB&T Memo at 11) the <u>last</u> thing that Witmeyer desired.  <u>See</u> Witmeyer Affidavit, paragraph 11.

## IV.     <u>Argument</u>.

### A.     <u>BB&T is Estopped by Its Conduct From Recovering Against Witmeyer and Can be Held Liable for its Misrepresentations</u>.

BB&T acknowledges, as it must, that the UCC does not eviscerate the common law:

> <u>Unless displaced by the particular provisions</u> of the Uniform Commercial Code, the <u>principles of law and equity</u>, <u>including</u> the law merchant and the law relative to capacity to contract, <u>principal and agent</u>, <u>estoppel</u>, <u>fraud</u>, <u>misrepresentation</u>, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause <u>supplement its provisions</u>.

Va. Code Ann. §8.1A-103(b) (emphasis added).  It is true, as BB&T argues, that "[w]here the U.C.C. and the common law both provide a means of recovery, the U.C.C displaces common

law." BB&T Memo at 8 (citing Equitable Life Assurance Soc. v. Okey, 812 F.2d 906, 909 (4th Cir. 1987)).  BB&T, however, can point to no provision of the UCC that insulates it from the consequences of providing false information to its customer.  While BB&T contends that in this case "the subject matter is a negotiable instrument that Witmeyer transferred to BB&T for deposit and collection," Witmeyer's counterclaim and his affirmative defense of estoppel place at issue BB&T's conduct after that transfer.

Although BB&T claims that it cannot be held responsible for the harm it caused Witmeyer, Courts considering similar misrepresentations by banks have had no difficulty applying the equitable defense of estoppel or in allowing independent claims for recovery based on such misrepresentations.

In J. P. Morgan Chase Bank, N.A. v. Mal Corp, 2009 U.S. Dist. LEXIS 23540 (N.D. Ill. March 26, 2009), Plaintiff J.P. Morgan Chase Bank, N.A. ("Chase") sued its customer for breach of his endorser obligations and transfer warranties after the customer deposited what turned out to be a counterfeit cashier's check into his account.  Although Chase argued that the defense of equitable estoppel had been displaced by the Illinois UCC transfer warranty provisions, the Court found that the customer's allegations that Chase had told it the check had cleared when it had not and that Chase failed to take action to prevent the loss, even though faced with indicia of a check fraud scheme, would give rise to an affirmative defense of estoppel.  Id. at *16-17.  In so ruling, the Court rejected Chase's argument that the defense of equitable estoppel had been displaced by the UCC transfer warranties.  Id. at *17.

Likewise, in First Nat'l Bank of Denver v. Ulibarri, 38 Colo. App. 428, 557 P.2d 1221 (Colo. App. 1976), Plaintiff bank sued to recover on a check made payable to Defendant Ulibarri, who had deposited the check, written by his customer, into his account with the bank.

Defendant, after being told by the bank that the check had been paid, released a diamond to the customer who had given him the check in payment.  The bank's representation was false and caused the Defendant to lose his merchandise, because the check was fraudulently drawn on a bank where the customer had no account.  The Court, relying on section 1-103 of Colorado's UCC, held that although by depositing the check for collection, the Defendant was liable for breach of his transfer warranties, the bank's claim was subject to the equitable defense of estoppel, which barred the bank's recovery.  Id at 1223.

The Court in First Georgia Bank v. Webster, 168 Ga. App. 307, 308 S.E.2d 579 (1983) also recognized an estoppel defense to a bank's claims based on UCC transfer warranties and endorser's liability where a customer wrote checks in reliance on a bank employee's false representation that a check deposited in his account was "good".

In Valley Bank of Ronan v. Hughes, 334 Mont. 335, 147 P.3d 185 (2006) bank personnel had assured the bank's customer that certain "official" checks he deposited were "the same as cash" and "would be good."  Id. at 338, 147 P.3d at 188.  In reliance on those representations, the customer wired money from his account and thereby became the victim of a so-called "Nigerian" check scam.  Id.  The court held that the trial court "erred by concluding that the UCC preempted common law and equitable principles with respect to the alleged misrepresentations."  Id. at 344, 147 P.3d at 192.

In Holcomb v. Wells Fargo Bank, N.A., 155 Cal. App. 4th 490, 66 Cal. Rptr. 3d 142 (2007), a bank's customer was originally told by a Wells Fargo teller that a "hold" would be placed on checks he deposited until Wells Fargo could "verify the funds" with the bank on which the checks were drawn.  Id. at 493, 66 Cal. Rptr. 3d at 145.  The customer later received a phone call from the teller, who informed him "that the funds had been verified and that he could begin

using the funds deposited." Id. This information was false, as the checks were eventually

returned for insufficient funds. Id. While affirming the bank's UCC right of chargeback, the

Court held, "There is nothing in the [UCC] prohibiting a claim based on a depositor's

detrimental reliance on a bank employee's incorrect statements". Id. at 498, 66 Cal. Rptr. 3d at

148.

All of these cases recognize the common-sense notion that a bank must be responsible for

the accuracy of information it provides to its customer. In the present case, BB&T indicated to

Witmeyer that the Check had cleared[1] when in fact it had not. Witmeyer relied on that

representation and wired over $200,000.00 in funds to Japan based on BB&T's representation.

### B.      The Bank's Lack of Good Faith Throughout its Interactions with Witmeyer Precludes Summary Judgment.

BB&T contends that as long as it did not lie to Witmeyer, it could treat him however it

wished with impunity. See BB&T Memo at 15. Its argument depends on a fundamental

misreading of the relevant UCC sections. Virginia Code section 8.01-203 (re-numbered as

8.01A-304 in 2003) provides, "Every contract or duty within this act imposes an obligation of

good faith in its performance or enforcement." According to BB&T, because Witmeyer's

counterclaim includes a specific reference to this UCC section, Witmeyer's position in this

litigation is limited by the definition of "good faith" set forth in Virginia Code section 8.1A-

201(20), which provides that "good faith" is "honesty in fact in the conduct or transaction

concerned."

BB&T fails to acknowledge to the Court that the definition section of the UCC upon

which it relies provides that the section's general definitions are "[s]ubject to definitions

contained in other titles of the Uniform Commercial Code that apply to particular titles or parts

---

[1] "If the term 'cleared' means anything in common banking usage, it is that final settlement has occurred." Valley Bank of Ronan, 334 Mont. at 345 n.6, 147 P.3d at 193 n.6.

thereof . . . . " Va. Code Ann. §8.1A-201(b).  Article 3 of the UCC, which is applicable to

negotiable instruments generally (see Va. Code Ann. §8.3A-102(a)) defines "good faith" as

"honesty in fact and the observance of reasonable commercial standards of fair dealing."  Va.

Code Ann. §8.3A-103(a)(4) (emphasis added).  This definition is imported into UCC Article 4,

which governs bank deposits and collections.  See Va. Code Ann. §8.4-104(b).  Consequently,

contrary to BB&T's assertion, the issue of whether BB&T has acted in "good faith" in the

present case is not limited to asking whether BB&T acted dishonestly.

When BB&T's actions are examined in light of the correct definition of "good faith,"

BB&T's attempt to hide behind the narrower, clearly inapplicable definition, makes strategic

sense.  BB&T's actions, at every significant juncture of its interactions with Witmeyer, failed to

adhere to the "reasonable commercial standards of fair dealing" required by the applicable

definition of "good faith."

Whether a bank has observed "reasonable commercial standards of fair dealing," depends

on a two-step analysis.  First, the factfinder must determine whether the party whose conduct is

at issue "complied with industry or 'commercial' standards applicable to the transaction and,

second, whether those standards were reasonable standards intended to result in fair dealing.

Each of those determinations must be made in the context of the specific transaction at hand."

Maine Family Fed'l Credit Union v. Sun Life Assurance Co. of Canada, 727 A.2d 335, 343

(1999).  A number of courts have explicitly adopted this approach.  See, e.g., Any Kind Checks

Cashed, Inc. v. Talcott, 830 So.2d 160, 165 (Fla. App. 2002) (Florida UCC); Iskum v. Nelson (In

re: Nelson), 2007 Bankr. LEXIS 3457, 64 U.C.C. Rep. Serv. 2d 124 (Bankr. Or. 2007) (Oregon

UCC); Experi-metal, Inc. v. Comerica Bank, 2010 U.S. Dist. LEXIS 68149 (E.D Mich. July 8,

2010) (Michigan UCC); Wawel Savings Bank v. Jersey Tractor Trailer Training, Inc. (In re:

Jersey Tractor Trailer Training, Inc.), 580 F.3d 147, 156-57 (3d Cir. 2009) (New Jersey UCC);

Buckeye Check Cashing, Inc. v. Camp, 159 Ohio App. 3d 784, 788-89, 825 N.E.2d 644, 646-47

(2005) (Ohio UCC); Gerber & Gerber, P.C. v. Regions Bank, 266 Ga. App. 8, 11, 596 S.E.2d

174, 178 (2004) (Georgia UCC).[2]

Where a bank has "violated known commercial banking standards" such violations create

a question of fact as to whether the bank has "observed reasonable commercial standards of fair

dealing."  See Gerber & Gerber, P.C. v. Regions Bank, 266 Ga. App. 8, 13, 596 S.E.2d 174, 179

(2004).  While "fairness" is the issue, whether BB&T acted fairly is judged "in light of

reasonable commercial standards."  San Tan Irrigation Dist. v. Wells Fargo Bank, 197 Ariz. 193,

197, 3 P.3d 1113, 1117 (Ariz. Ct. App. 2000) (cited in BB&T Memo at 16).

BB&T failed miserably at every juncture to adhere to industry practice in its treatment of

Witmeyer. For example, BB&T violated standard practices in dealing with Witmeyer when it

provided provisional credit on a large cashier's check and authorized an overseas wire transfer of

over $200,000.00 even though it knew the Check was the result of an internet transaction.  See

Williams Report at 36-39.  Likewise, its provision of inaccurate, misleading information violated

standard banking practices (see id. at 38) as did its destruction of the Check after it knew the

Check was a counterfeit.  Id.  BB&T also violated standard banking practices when it initially

failed to place a hold on the Check.  Id. at 36.  BB&T's conduct failed to conform with

applicable banking industry practices and therefore failed to adhere to any reasonable

---

[2] BB&T cites PNC Bank v. Martin, 2010 U.S. Dist. LEXIS 85635 (W.D. Ky 2010) for its contention that the transfer warranty provisions of the UCC isolate its wrongful conduct from any scrutiny and deny Witmeyer any remedy for BB&T's false statement concerning the status of the Check.  In Martin, however, the Plaintiff did not rely on any of the case law cited by Witmeyer on this issue, but instead focused his arguments on pre-UCC Kentucky law and case analysis of whether the bank had exercised "good faith" in the handling of the check (but not in connection with any false representations).

commercial standards.  The result of this failure is that BB&T seeks to hold Witmeyer liable for the consequences of BB&T's acts.  A more unfair outcome could hardly be imagined.

A Bank's failure to adhere to its own written policies and procedures is also evidence of its failure to observe reasonable commercial standards.  See New Props. v. George D. Newpower, Jr., 2006 Mich. App. LEXIS 2668 at 17, 60 U.C.C. Rep. Serv. 2d 1373 (Mich. Ct. App. 2006); Torino Constr. Corp. v. Ensign Fed. Cr. Union, 111 Nev. 1515, 1519, 908 P.2d 702, 704 (1995) (noting that "a bank's failure to follow its own normal procedures indicates that the bank failed to act in accordance with reasonable commercial standards"); Buse v. Vanguard Group, 1996 U.S. Dist. LEXIS 19033 (E.D. Pa. December 24, 1996) (whether bank followed its company policies and procedures "is factor to be considered in the determination whether it acted in accordance with reasonable commercial standards"); Al Sarena Mines, Inc. v. South Trust Bank, 548 So.2d 1356, 1364 (Ala. S. Ct. 1989) (considering evidence presented that bank had deviated from its policies and procedures manual as bearing on whether bank acted in accord with reasonable commercial standards); Inventory Locator Service, Inc. v. Dunn, 776 S.W.2d 523, 527 (Tenn. Ct. App. 1989) (noting that "a bank's failure to follow its own normal procedures is indicative of a failure to act in accordance with reasonable commercial standards").

BB&T's unilateral decision to grant "provisional credit" for the Check shows its lack of good faith.  BB&T's own "hold policy" dictated that it should not have provided provisional credit and should not have authorized the wire transfer out of Witmeyer's account.  See Brenda Street Deposition at 17, line 15, to 16, line 11, and Exhibit 2 thereto; Deposition of Wanda Hassler, Witmeyer Exhibit I hereto, at 18, lines 1-13.

BB&T's "Hold Policy" provides in pertinent part:

NEXT DAY AVAILABILITY FOR PURPOSES OF WIRING FUNDS:

> The wiring out of funds on a next day availability basis is allowed if the funds deposited are from the deposit of state and local government checks, cashier's, certified, teller's or official checks. However, <u>the client must notify the Teller at the time of the deposit and must segregate the checks from other checks being deposited</u>.

Brenda Street Deposition Exhibit 2 at BB&T 044 (emphasis added).

> That policy also provides:

>> <u>Special next day wire availability can apply</u> to deposits of state and local government checks, cashier's, certified, teller's or official checks <u>if the request is made in person</u> by the client <u>and the client segregates the checks from other deposited items</u>.

>> Care must be taken to ensure that the item is a state and local government checks, cashier's, certified, teller's or official checks. Tellers should consult their Manager/Supervisor if there is doubt that the item is eligible for this special provision.

>> - <u>Teller must check the Special Availability Box</u> on PC Teller and indicate the amount of the check.

>> - <u>Prepare a Miscellaneous Credit Ticket</u> using Tran Code 3575.

>> - <u>Provide a copy of the validated Client Copy of the Miscellaneous Credit to the client</u>.  "Special Availability" will print on the validation.

>> BB&T is a next day availability bank for all purposes other than wire transfer.  Therefore, <u>it is not necessary to use this special provision unless the client has a need to transfer the funds</u> by wire the following business day.

>> Tellers/Relationship Bankers should follow this process <u>only</u> if requested by the client-do not offer this as a service.

<u>Id</u>. at BB&T 050-051 (emphasis added).

Ms. Street and Ms. Hassler failed to observe <u>any</u> of these provisions when deciding whether to authorize the wire transfer from Witmeyer's IOLTA trust account.  Indeed, Ms. Street admitted that she had never seen that portion of the Hold Policy dealing with next day

availability for wire transfers.  Brenda Street Deposition at 16, lines 16-25.  She acknowledged however, that the Check was not segregated from the rest of the deposit as required by the Hold Policy.  Id. at 17, lines 6-17.

Ms. Hassler, who has been a BB&T employee for thirty years, and was, in June of 2009 a "financial center leader" - - BB&T's job title for Branch Manager - - (Wanda Hassler Deposition at 5, lines 8-9, 15-24; 6, lines 17-25) testified that the only factor she considered to decide whether to authorize the wire for Witmeyer was whether the funds were "available," by which she meant that "the client had provisional credit for that amount of money."  Wanda Hassler Deposition at 14, lines 20-24; 16, lines 5-8.  Ms. Hassler admitted, however, that she was unaware of BB&T's written policies and procedures governing whether to make wire transfers. Id. at 17, lines 16-25.  When shown the Hold Policy during her deposition, Ms. Hassler did claim to be familiar with it.  Id. at 18, lines 1-11.  When questioned specifically concerning that section of the Hold Policy governing next day availability for wire transfers, she admitted that in June of 2009 she "probably had not read it that recently."  Id at 18, lines 14-21.

Additionally, the BB&T employee handling the wire transfer did not comply with the special directions set forth for wire transfers in the Hold Policy.  See Brenda Street Deposition Exhibit 2 at BB&T 050; Brenda Street Deposition at 31, lines 6-25; 32, lines 1-5; 13, lines 9-14; 14, lines 12-25; 15, lines 1-10; Wanda Hassler Deposition at 14, lines 20-25; 15, lines 1-14.

The Hold Policy also instructs "Relationship Bankers" such as Ms. Street (see Brenda Street Deposition at 5, lines 8-17) not to offer next day wire service to a customer, but to do so "only if requested by the client . . . . "  Brenda Street Deposition Exhibit 2 at BB&T050.  Instead, this "special provision" of the Hold Policy should not be invoked "unless the client has a need to transfer the funds by wire the following business day."  Id. (emphasis added).  Witmeyer had no

14

such "need".  Witmeyer Affidavit at 17.  These failures to comply with BB&T's own policies and procedures indicate BB&T's failure to observe reasonable commercial standards of fair dealing.

In <u>Wachovia Bank NA v. Federal Reserve Bank of Richmond</u>, 338 F.3d 318 (4th Cir. N.C. 2003), the Court addressed whether a bank suing on UCC presentment warranties acted in good faith when it failed "to review high-dollar checks manually . . . . "  <u>Id</u>. at 322-23.  The Court observed that "[b]ecause Wachovia, or any bank, must process a check prior to issuing payment on it, <u>Wachovia's processing procedures are relevant to its good faith in paying the check</u> at issue . . . . "  <u>Id</u>. at 322 (emphasis added).  Although the Federal Reserve Bank ("FRB") attempted to prove that Wachovia's standard procedures were commercially unreasonable, the Court found that FRB had failed to provide any indication that Wachovia's standard procedures resulted in unfairness to FRB in the transaction.  <u>Id</u>. at 323.

The situation is far different here, in that BB&T failed to follow its <u>own</u> policies and procedures in dealing with Witmeyer.  Those deviations from its policies and procedures are evidence that it failed to observe reasonable commercial standards.  The results, for Witmeyer, were patently unfair.  <u>See</u> <u>Mal Corp</u> at *13-14 (listing violations of internal protocol, policies and procedures among the allegations that set forth claims that bank failed to act in good faith).

As the Court in <u>Maine Family</u> observed, "the drafters [of the UCC] limited the requirement of fair dealing to conduct that is reasonable in the commercial context of the transaction at issue.  In other words, the [party whose conduct is at issue] must act in a way that is fair according to commercial standards that are themselves reasonable."  727 A.2d at 343.

Where a bank fails to abide by prudent banking practices, ignores its own policies, destroys evidence, and makes materially false representations to its customer, it cannot foreclose

the possibility that a jury will find it failed to treat its customer "fairly" in the context of the commercial standards applicable to its conduct.  When the correct definition of "good faith" is applied, BB&T's conduct falls woefully short and has two consequences.  BB&T's lack of good faith forms the basis for Count I of Witmeyer's Counterclaim and for an affirmative defense to BB&T's claims against him.  At each step of its interactions with Witmeyer, BB&T failed to observe reasonable commercial standards of fair dealing.

### C.   BB&T Breached its Duty to Act With Ordinary Care in its Dealings With Witmeyer.

BB&T argues that, because it took the Check for collection, its only duty of ordinary care was in presenting the Check and sending it for presentment.  BB&T Memo at 19-20 (citing Va. Code Ann. §8.4-202(a)).  Nothing in the statute upon which BB&T relies, however, indicates that a bank owes a duty of ordinary care to its customer only in the situations enumerated in the statute.  Indeed, the Virginia Comment to UCC §8.4-402 discusses how the duty imposed by that section "is in accord with the general views expressed in First Wisconsin Nat'l Bank v. People's Nat'l Bank, 136 Va. 276, 284-88, 118 S.E. 82 (1923)," but observes that First Wisconsin also recognized other instances in which a bank's duty of due care arose and notes that "[t]he U.C.C. is silent as respects those other duties owed by a collecting bank to its principal."  Va. Code Ann. §8.4-202, Virginia Comment (emphasis added).  The Virginia comment does not indicate that section 8.4-202 displaces such other duties.

BB&T argues that because a bank has a duty to act with ordinary care in "sending notice of dishonor" and in "settling for an item" that it is free to misrepresent the status of that item prior to dishonor or final settlement and suggests (BB&T Memo at 20) that its freedom to misstate facts is to be found in Virginia Code section 8.4-201.  That UCC section, however, says nothing of the sort.  Instead, it provides that, under most circumstances, "before the time that a

settlement given by a collecting bank becomes final, the bank with respect to the item, is an agent or subagent of the owner of the item and any settlement given for the item is provisional." Va. Code Ann. §8.4-201. It does not provide that a bank may misrepresent whether settlement for an item has become final. Moreover, the official comment to this section states that a bank's "status [as agent or owner of an item taken for collection] may have importance in some residual areas not covered by specific rules." Va. Code Ann. §8.4-201, official comment 2. One of these "residual areas" is an agent's duty to account accurately to its principal. BB&T failed miserably in that duty toward Witmeyer.

### D.   **BB&T is Not Entitled to Summary Judgment on Witmeyer's Counterclaim.**

1.   Witmeyer Has A Claim For Negligence.

Witmeyer raises five counterclaims based on BB&T's misconduct. First, Witmeyer seeks to hold BB&T responsible for its negligence. BB&T argues that its only duty of ordinary care arose upon its presentment of the Check for payment. See BB&T Memo at 21. As discussed above, BB&T's duty to use ordinary care was not so limited.

2.   Witmeyer Has A Claim For BB&T's Breach of Its Duty of Good Faith.

Count II of Witmeyer's counterclaim is for breach of BB&T's statutory duty of good faith. BB&T claims, without citation to authority, that "there is no cause of action as [sic] breach of good faith under Virginia's U.C.C. § 8.1-A-304 . . . . " As the statute makes plain, however, "every contract or duty within the Uniform Commercial Code imposes a duty of good faith in its performance and enforcement." Va. Code. Ann. §8.1A-304. While Virginia law makes clear that breach of this provision does not give rise to an independent claim in tort, it does give rise to a cause of action for breach of contract. See Charles E. Brauer Co. v. Nationbank, 251 Va. 28, 33, 466 S.E.2d 382, 385 (1996). As discussed above, the duty of good faith for purposes of UCC

Articles 3 and 4 encompasses both honesty in fact and the observance of reasonable commercial standards of fair dealing, and BB&T breached that duty of good faith.

       3.    <u>Witmeyer Has A Claim for Constructive Fraud</u>.

       Count III of Witmeyer's counterclaim is for constructive fraud.  BB&T poses two arguments against the validity of this counterclaim.  First, it contends that the counterclaim "is contradicted by the testimony of [Witmeyer's] bookkeeper . . . . "  BB&T Memo at 22.  Nothing in the record, however, contradicts Witmeyer's testimony that BB&T's employee, Ms. Street, confirmed to Witmeyer that the Check had cleared and that it was on that basis that Witmeyer went ahead with the wire transfer on June 4.

       BB&T also contends that "the misrepresentation in this case was made by Witmeyer when he transferred the item and caused BB&T to rely upon his misrepresentation that he not only had the right to enforce the instrument, but that the signature on the Check was authentic and authorized signature of Citibank."  BB&T Memo at 22.  Witmeyer's transfer warranties, however, are limited in their application and consequences by the statute that imposes them.  <u>See</u> Va. Code Ann. §8.4-207.1.  That statute grants a right of recovery under certain circumstances. It does not create an affirmative defense or bar a bank customer from seeking damages based on a bank's misrepresentation.  To hold otherwise would mean that in every case where a customer deposits a check for collection without knowing of any irregularity pertaining to its signature, he forfeits any right to rely on any information the bank provides him regarding the status of the deposit.  BB&T cites no authority for this position.

       According to BB&T, "Witmeyer's complaint about BB&T stating the check cleared would be no more than BB&T telling him the item was authentic and authorized."  BB&T Memo at 26.  On its face, BB&T's argument makes no sense.  The statement, "The signature on this

check is authentic," is not the equivalent of the statement, "This check has been paid." BB&T does not allege, nor can it, that Witmeyer knew the Check was a counterfeit. BB&T told Witmeyer the Check had cleared , and in reliance on that representation, he authorized BB&T to make the wire transfer that created the mess BB&T now seeks to clean up at Witmeyer's expense. If BB&T had not misrepresented to Witmeyer that the Check had cleared, then the "provisional credit" BB&T had provided could have been reversed without consequence to anyone. BB&T's misrepresentation caused Witmeyer to wire uncollected funds that BB&T was unsuccessful in retrieving. If, instead of indicating to Witmeyer that the Check had cleared, Ms. Street had told him, "I don't know whether or not it has cleared. We are relying on your statutory warranty that the signature on the Check is authentic and authorized," Witmeyer would not have completed the wire transfer and no problem would exist.

### E.    BB&T Breached its Fiduciary Duty and Converted Trust Funds.

Counts IV and V of Witmeyer's counterclaim are for breach of fiduciary duty and conversion. Because the Account at issue was an IOLTA Trust Account, BB&T owed a fiduciary duty to Witmeyer's customers that it breached by converting their funds to provide a partial repayment of the amount of the wire transfer.

It is true that the UCC does not create a fiduciary relationship between a bank and its customer. Where, however, a bank knows that an account is an escrow account, the usual debtor-creditor relationship between the bank and its depositor does not arise. See Jones v. Sovran Bank, Nat. (In re: Nat Warren Contracting, Inc.), 905 F.2d 716, 718 (4th Cir. 1990) (where funds are deposited into a "special account" the deposit does not become the property of the bank) (citing Bernardini v. Central Nat'l Bank, 223 Va. 519, 521, 290 S.E.2d 863, 864 (1982)

("where funds are deposited for a special purpose with notice to the bank, the deposit does not become the property of the bank")).

"A special deposit is sometimes said to be the equivalent to a bailment." First Nat'l Bank v. Commercial Bank & Trust Co., 163 Va. 162, 171, 175 S.E. 775, 778 (1934).  Thus, "[a] bank accepting such a deposit is chargeable with the responsibility, civil or criminal, like any other trustee, if it uses for itself what was to be held in trust for someone else." Id. at 172, 175 S.E. at 778 (emphasis added).  Accordingly, by accepting deposits into Witmeyer's IOLTA Trust Account, the bank accepted a fiduciary duty to Witmeyer's clients, who were the beneficial owners of the account's contents.  Given that relationship, BB&T breached a fiduciary duty to Witmeyer's clients when it took their funds to satisfy what BB&T has characterized as a personal debt of Witmeyer based on endorsement and transfer warranty liabilities.  See Jones v. United States Fidelity & Guaranty Co., 165 Va. 349, 355-56, 182 S.E. 560, 562 (1935) (where funds in account were fiduciary funds and bank knew this, it 'had no right to accept them in satisfaction of its personal claim against" its depositer).

Witmeyer, as the attorney for the clients whose funds BB&T converted, has standing to bring such claims on their behalf.  See Radin v. Crestar Bank, 249 Va. 440, 442, 457 S.E.2d 65, 66 (1995); Weichert Co. v. First Commercial Bank, 246 Va. 108, 109, 431 S.E.2d 308, 309 (1993).  Accordingly, BB&T is liable to Witmeyer for breach of fiduciary duty and conversion.

**F.      BB&T is Not Under Any Circumstances Entitled to Attorney's Fees.**

BB&T claims that it is entitled to an award of attorney's fees under the transfer warranty provisions of Virginia Code sections 8.4-207.1 and 8.3A-316, which provide for recovery of damages of "not more than the amount of the item plus expenses and loss of interest incurred as a result of the breach."  Va. Code Ann. §§8.3A-316(b); 8.4-207.1(b).  Official Comment 6 to Va.

Code Ann. §8.3A-416 states that "attorney's fees are not meant to be necessarily excluded." According to the UCC's drafters, "The intention is to leave to other state law the issue as to when attorney's fees are reasonable." <u>Id</u>.  BB&T does not direct the Court to any "other state law" that would entitle it to fees.  Indeed, Virginia law interprets extremely narrowly the circumstances under which such fees can be awarded.  Virginia follows the "'America Rule'" strictly and does not ordinarily allow for an award of attorney's fees "'in the absence of a <u>specific</u> contractual or statutory provision to the contrary.'" <u>Nusbaum v. Berlin</u>, 273 Va. 385, 400, 641 S.E.2d 494, 501 (2007) (<u>quoting</u> <u>Lannon v. Lee Conner Realty</u>, 238 Va. 590, 594, 385 S.E.2d 380, 383 (1989)) (emphasis added); <u>see</u> <u>Russell County Dept. of Social Services v. O'Quinn</u>, 259 Va. 139, 142, 523 S.E.2d 492, 493 (2000) (declining to find a "specific statutory grant of authority" for attorney's fee award in declaratory judgment act's general authority to provide "further relief").

BB&T's argument is circular.  If the UCC provision at issue leaves it to "other state law" to dictate whether to award attorney's fees, then that same UCC provision cannot be the "other state law" that authorizes that relief.  On its face, the UCC transfer warranty provisions do not specifically authorize attorney's fees and BB&T is not entitled to recovery of those fees.

### V.      <u>Conclusion.</u>

BB&T is seeking to correct its internal mistakes at Witmeyer's expense.  If BB&T had not misled Witmeyer, there would have been no wire transfer and no loss to anyone.  BB&T's Motion for Summary Judgment should be denied.

CARL J. WITMEYER, II


By: _____/s/_____
            Of counsel

David D. Hopper, Esquire
Virginia State Bar number: 30038
Attorney for Carl J. Witmeyer, II
Cook, Heyward, Lee, Hopper & Feehan, P.C.
4551 Cox Road, Suite 210
P.O. Box 3059
Glen Allen, Virginia 23058-3059
Telephone: (804) 747-4500
Facsimile:  (804) 762-9608
ddhopper@chlhf.com

## **CERTIFICATE**

     I hereby certify that on this 27th day of September, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Daniel S. Fiore, Esquire
531 Lee Highway
Arlington, Virginia 22207
daniel.fiore@fiorelevine.com

*Counsel for Branch Banking & Trust Company*

_____/s/_____
David D. Hopper, Esquire
Virginia State Bar number: 30038
Attorney for Carl J. Witmeyer, II
Cook, Heyward, Lee, Hopper & Feehan, P.C.
4551 Cox Road, Suite 210
P.O. Box 3059
Glen Allen, Virginia 23058-3059
Telephone: (804) 747-4500
Facsimile:  (804) 762-9608
ddhopper@chlhf.com