IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| BRANCH BANKING AND TRUST COMPANY | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 3:10CV055 |
| | ) |
| CARL WITMEYER II | ) |
| | ) |
| Defendant | ) |
| ---------------------------------------------------------------------- | ) |
| CARL WITMEYER II | ) |
| | ) |
| Counterclaim Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| BRANCH BANKING AND TRUST COMPANY | ) |
| | ) |
| Counterclaim Defendant | ) |
| | ) |

### *BRANCH BANKING AND TRUST COMPANY'S REPLY IN OPPOSITION TO WITMEYER'S MOTION FOR SUMMARY JUDGMENT*

COMES NOW, Branch Banking and Trust Company (hereinafter "BB&T"), by Counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56, and for its reply in opposition to Witmeyer's Motion for Summary Judgment, respectfully presents the following:

### Discussion

Witmeyer's Motion for Summary Judgment asks the Court to recognize a defense of estoppel and to grant him judgment on his counterclaims for constructive fraud, breach of fiduciary duty and conversion.  Witmeyer's motion is based on this alleged central fact: when Witmeyer went to BB&T to wire the $223,200.00 to BECALM in Japan, he was told by the bank that the Citibank check had cleared and, in reliance thereon, Witmeyer wired the funds to Japan.

If, contrary to Witmeyer's argument, equitable estoppel is not a defense to a bank's right to charge-back; or if, as a matter of law, BB&T did not owe a duty to Witmeyer; or if Witmeyer's rendition of the aforesaid central fact is incorrect, his defense of estoppel fails and he does not have a claim for constructive fraud, breach of fiduciary duty or conversion.[1]

In addition to the discussion to follow, BB&T incorporates its Memorandum in Support of its Motion for Summary Judgment filed on September 13, 2010 (Doc. 10) and its Rebuttal Memorandum in Support of its Motion for Summary Judgment filed on October 4, 2010 (Doc. 16). Witmeyer's Motion for Summary Judgment should be denied.

### A. As a matter of law, BB&T did not owe a duty to Witmeyer

Pursuant to the UCC, BB&T did not owe a duty to Witmeyer. According to Witmeyer, the wrong committed upon him occurred at the time he was at the bank to wire the funds. The Uniform Commercial Code-Funds Transfers, adopted by the Virginia General Assembly, as Title 8.4A of the Code of Virginia, applies to funds transfers, which is a transaction that begins with an originator's payment order to make a payment to a beneficiary. *See* VA. CODE ANN. § 8.4A-104(a). So what duty did BB&T owe Witmeyer when he wired the funds? To answer this question, we must discuss the relationship between the parties.

When Witmeyer went to BB&T on June 4, 2009, to wire the $223,200.00 to BECALM CO LTD ("BECALM"), Witmeyer was the originator, as he was the first sender of the first payment order in the funds transfer. *See* VA. CODE ANN. § 8.4A-104(c) (*"'Originator' means the*

---

[1] Witmeyer states in his memorandum, as he did in his affidavit, that he was not in a hurry to wire the funds. The record shows otherwise. He knew that the deposit was not effectively made until June 3, 2009, which meant the check could not have been received by Citibank any sooner than June 3, 2009 and as a matter of law, Witmeyer knew Citibank would have had until midnight of June 4, 2009, at the very earliest to pay or return the check. *See* VA. CODE ANN. § 8.4-302. Witmeyer was in fact in a hurry when he went to BB&T on June 3, 2009, to wire the funds to Japan. Instead of being so eager to wire the $223,200.00 to Japan on June 4, 2009, he should have telephoned Citibank, the payor bank of the item.

sender of the first payment order in a funds transfer."); VA. CODE ANN. § 8.4A-103(a)(5) ("'*Sender*' means the person giving the instruction to the receiving bank.")  BB&T was the receiving bank. *See* VA. CODE ANN. § 8.4A-103(a)(4) ("'*Receiving bank*' means the bank to which the sender's instruction is addressed").  Witmeyer has admitted he authorized the transfer of funds.  Witmeyer states that he "went in person to BB&T for the purpose of effecting a wire transfer" and he admitted that he signed the payment order.  *See* Exhibit A, Affidavit of Witmeyer, ¶ 5; *see also* Exhibit B, Witmeyer's Deposition Transcript, pp. 61:24-62:4, 65:16-19 (stating that he reviewed and signed the written wire instruction) and Exhibit C, Wire Transfer Request Agreement.  Therefore, Witmeyer issued a payment order to BB&T.

A payment order is an instruction to a receiving bank to pay a fixed amount of money to a beneficiary, if: "(i) the instruction does not state a condition to payment to the beneficiary other than time of payment, (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender, and (iii) the instruction is transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system, or communication system for transmittal to the receiving bank." VA. CODE ANN. § 8.4A-103(a)(1).  By written instruction signed by Witmeyer at BB&T, BB&T transferred the sum of $223,200.00 to the beneficiary BECALM.  The written instruction simply directed the receiving bank BB&T to debit account number xxxxxxxxx6184, Witmeyer's IOLTA account and send the funds to BECALM.  *See* Exhibit C, Wire Transfer Request Agreement.

As the parties agreed, BB&T's duties and liabilities are subject to UCC Article 4A.  "The rights, duties and liabilities of the parties the this Agreement shall be subject to Uniform Commercial Code Article 4A as in effect in the State where this Agreement was executed." Exhibit C, Wire Transfer Request Agreement, p. 2.  Being the receiving bank, BB&T was not

Witmeyer's agent and did not owe Witmeyer any duty except as provided in Article 4A or by express agreement.  *See* VA CODE ANN. § 8.4A-212 ("A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any party to the funds transfer except as provided in this title or by express agreement").  There was no express agreement between these parties except to wire the sum of $223,200.00 to BECALM and there was not an Article 4A duty that would apply in this case.  *See* (Rebuttal Memo, Doc. 16, pp. 8-10).  Therefore, BB&T did not owe a duty to Witmeyer.  The facts alleged by Witmeyer to support his estoppel defense and his constructive fraud claim arises from the funds transfer transaction and since BB&T did not owe a duty to him, as a matter of law, his estoppel defense and his constructive fraud claim fail.

### B.   There is not an equitable estoppel defense to a bank's right of charge-back

In support of his motion for summary judgment to defeat BB&T's claim on the defense of estoppel, Witmeyer cited to *Valley Bank of Ronan v. Hughes*, *334 Mont. 335, 147 P.3d 185* (MT 2006), for the proposition that a bank's misrepresentation could impair a depositary or collecting bank's right of charge-back.  Three years after *Hughes*, in *Avanta Federal Credit Union v. Shupak*, 223 P.3d 863 (MT 2009), the Supreme Court of Montana explained that it "did not address [in *Hughes*] whether equitable estoppel might prevent the bank from exercising its charge-back rights because the parties did not raise that issue on appeal."  *Id*. at 870.  Addressing an equitable estoppel defense to a charge-back, the Court recognized that the "bank's [statutory] charge-back right terminates only upon the final settlement of the check."  *Id*. at 871.  The Court then held that equitable estoppel is not a defense to a bank's right of charge-back.  *Id*.  Moreover, *Hughes* would be distinguishable because in that case a statement was made by the bank that a

cashier's check was as good as cash, whereas, here, Witmeyer received a transaction receipt stating the credit was provisional.  Lastly, *Hughes* is of questionable persuasive value.  Comment 3 to UCC § 8.3A-312, basically states that a limitation period for the enforceability of a claim involving a lost cashier's check "ensures the continued utility of cashier's checks, teller's checks, and certified checks <u>as</u> <u>cash</u> <u>equivalents</u>", which apparently was not addressed by the *Hughes* court.  (emphasis added).

**C. If VA. CODE ANN. § 8.4A-212 had not made clear that no duty was owed to Witmeyer or if an equitable estoppel defense or constructive fraud claim could be permissable, the record shows that Witmeyer was not told the check cleared.**

This discussion addresses both to Witmeyer's equitable estoppel defense and his Counts III, IV and V to his Counterclaim, constructive fraud, breach of fiduciary duty and conversion, respectively.

We have established that as a matter of law that a duty was not owed to Witmeyer and, therefore, Witmeyer's argument in his memorandum that "[i]f he not been told the Check had cleared, he would not have authorized BB&T to make the wire transfer from his IOLTA account" is irrelevant.  *See* (Witmeyer's Memo in Support of Motion for Summary Judgment, Doc. 27, p. 2). Even so, there is no evidence in the record that he was told any such thing.  In his deposition, Witmeyer testified about his trip to the bank to wire the funds to BECALM as follows, and it is being recited to show that which was <u>not</u> said as much as that which was said:

> A     Well, I walked into the branch and I remember seeing a, a woman that, you know, I don't know her name, that was seated at the desk.  And, of course, fortunately for me, she said, how are you, Mr. Witmeyer?  And I said, I'm fine, and I believe I need to see Brenda or Wanda.  And I was reading off of a piece of paper that my bookkeeper had given me.
> Q   All right.
> A   And she told me to have a seat and wait.
> Q     All right.  And you were intending to wire part of the check

you received overseas?

A    No.  I think I was intending to transfer some of the money from the check that was deposited.

Q   To a bank in Japan?

A   Yes.

Exhibit B, Witmeyer's Deposition Transcript, pp. 31:12-32:1.

Q    All right.  But you went to the bank to make the wire transfer to Japan?

A   Yes.

Q   Okay.  And do you know whether once a wire transfer is made, it cannot be recalled, or did you not know either way at that time?

A    Well, I was told by Ms. McMichael that they were trying to recall it when I asked her on June 8th over the phone had they tried to retrieve the money.

Q   Let me try to focus you at the time that you were making the wire transfer.

A    I had no knowledge about a wire transfer at all, other than what the bank employees and Mrs. Williamson told me.

Q    All right.  So, what did the bank employees and Ms. Williamson tell you about a wire?

A    Well, Mrs. Williamson told me who to see and that I would have to sign a form.  I already said that.  When I went to the bank, again, I was, I asked to see, I believe her name was Brenda.  I was asked to wait.  She came out, I went into her office, and I said that I understand you or someone here has talked to my bookkeeper, Becky, which I think they all pretty much knew her by her first name, because the funds had cleared into my account and I was to see you to have a wire transfer done.  And she said, let me check.  Again, I was across the table from her, you know, I don't know if she checked a computer or whether there was a form there or what.  I don't know what she did.  But she then said, I can do that for you.  And she said, do you have the information?  And I handed her the E-mail.

Q    Now, was she asked to check anything?  You said she told you, let me check.  Was she asked by you to check anything?

A    No.  I basically just said, I was told that this was true.  I didn't say, will you check for me.  She said, let me check, that's my recollection, after I told her what I wanted to do and why I was there.

Q    Okay.  I'm sorry to ask you to do this because I didn't completely follow your testimony.  After you introduced yourself to Ms. Hassler –

A   No.  It would have been Brenda.

Q   I mean, Ms. Street.

A    Okay.

Q    Sorry.

A    If that's her last name, yes.

Q    To Brenda?

A    Yes.

Q    You then sat down or did you sit down first and introduce yourself?  Do you recall?

A    I think she came out to the -- If you've been to that bank, I'm assuming you have, there's an area you walk in, it's like a lobby, and the tellers and the ATM are on the left and the offices are on the right, and it looks like the vault is straight ahead.  So, I would have sat in the lobby in the middle as you walked in, and she would have come to me and greeted me.  And then I would have gotten up because she said, come to my office, and I would have followed her to her office.  And then I'm sure she sat down and then I did.

Q    All right. And which branch is this?

A    This is the Sliding Hill branch, which is just down the street.

Q    Okay.  Then after you sat down, what did you say to Brenda?

A    I said, I was told to see you because these funds had cleared into my account and I was here to do this wire transfer based on my client's instruction, or words to that effect.  I don't know if I said per my client's instruction.  And she said, let me check.  Now, again, I don't know what she did.  She said, I can do that.

Q    Did you see her pick up the phone at all?

A    I don't recall what she did.  I honestly don't know if she picked up the phone or if she looked at someone or if she looked on her computer screen.  I don't recall.

Q    But as you sit here, you don't have any recollection of her speaking with anyone else?

A    She said, let me check, and she did something, and I don't recall what it was because I might have read something else or looked down or whatever.

Q    Did she get up and leave?

A    I think she did at some point.  But I don't know if that was right away.  She might have gotten up then, but I do think she got up later.

Q    Okay.  So, as we sit here today, you don't have a recollection of her speaking with anyone on the phone?  You don't have a recollection either way?

A    I know at some point she brought Wanda Hassler into the office, and she might have done that over the phone.  But I don't recall –

Q    No, no, no.  What you would have seen.  I'm not asking that she may have gone out somewhere and used the phone.  I'm asking –

A    I think she did go out.

Q    -- what you saw.  No –

A    I think she did –

Q    -- that isn't my question.

A    Okay.  I'm sorry.

Q    What did you see?

A    I don't remember.

Q    Did you see her on the phone at all?

A    I don't know.  I don't know if she got on the phone or whether she left or both.  I don't recall.

Q    Okay.  The only thing you recall is her saying, let me check, and you don't recall anything in-between until she then said something to you?

A    Yeah.  My recollection is she said, I can do that for you.

Q    Okay.  So, then what happened?

A    I handed her the information because she said she had to fill out a form.  And the information would have been the amount of the transfer and the bank the money was being transferred to.

Q    Did you read the form?

A    After she typed it, I did, yes.

Q    Did you provide the information to her?

A    I provided some of the information.

Q    Okay.  What information did you provide?

A    I didn't provide my bank account number.  She had that.

Q    Did you provide that to her earlier?

A    No.

Q    Well, how did she know where to wire the funds from?

A    I told her it was coming out of my trust account.

Q    Okay.  Is that before or after she said, let me check?

A    I can't recall.

Q    All right.

A    It was at the same period of time.

Q    Would you have handed her any papers?

A    I'm sure I handed her this information about the bank and the amount that would have been on the E-mail, yes.

Q    All right.

A    Because I wouldn't have had that otherwise.

Q    All right. And then she typed out the form with the information that you provided to her?

A    In addition, she put other information on that. But, yes, she did take the information from me and use that to type out part of the form.

Q    Okay.  And the other information she would have put on there would be your name and your account number that you would have been able to have obtained –

A    I don't have the form in front of me, but she would have put all

the information on there except for my signature, yes.

Q   Okay.

A   I didn't do that.

Q   All right.  And then she handed the form to you, correct?

A   Yes.

Q   You reviewed it?

A   She asked me to read it.

Q   And you read it?

A   I did.

Q   And you approved it?

A     She was explaining to me while I was reading what the process was because I had questions –

Q   Okay.  And what questions –

A     -- because, again, I had never done this before. Well, I asked her what time frame this would be, how long would it take.

Q   Why was that important?

A     Well, my client had asked me to notify him with that information after the wire transfer had been completed. I also recall asking her what the process was because I didn't know.  I didn't know if they sent a check or they sent, they just did a wire information to a computer.  So, she and I had a very general conversation about wire transfers while I was there.

Q   And what did she tell you?

A   I can't recall everything, but she pretty much told me –

Q   Can you tell me what you can recall?

A     -- that it was an instruction from her bank to another bank to have the funds transferred.  And I still have no understanding as to how that's done.

Q   Okay.

A   She also told me how long it might take.

Q   And what did she tell you about that?

A     She said there was a time differential is what I remember.  I don't remember her giving me any specifics except to say, well, there's a time differential.  So, I inferred from that it wasn't going to be immediately that second, if that's what you're asking.  I mean, she did have some conversation with me, and I inferred that it wasn't     going to happen in a minute.

Q     All right.  Did she state anything else to you prior to your approving the wire?

A   She showed me where I needed to sign it.  She told me that she would have to have Wanda come in to authorize it because two bank employees, this is my recall, had to authorize my request, that I was requesting the transfer and they were authorizing it.  I recall that.

Q     And did she tell you that the other employee had to witness your signing it?

A    I don't know.  I recall that she said that two bank employees had to sign, authorizing the transfer.  I don't know that she said that they had to actually watch me sign it.

Q    All right.  And did you then sign it?

A    Well, she also asked me to make sure that the information was consistent or accurate based on what I had shown her.  And I did review that to compare the two, and then I signed it.  And she told me where to sign it.

Q    All right.  And then was Wanda there at that time?

A    I don't recall.

Q    All right.

A    I don't think so, but I don't recall.

Q    Okay.  So, prior to your signing, do you recall Brenda telling you anything else besides what you've already testified to?

A    I don't recall the entire conversation.  But what I've told you is what I do recall.

Q    All right.  And then Brenda came into the office?

A    No.  Wanda came into the office.

Q    I'm sorry, Wanda, came into the office?

A    Yes, she did.

Q    All right.

A    I think their offices were next to each other.  I don't know where she came from, but she did come into the office while I was seated there.

Q    Okay.  And then did you have pleasantries with Wanda and she knows who you are?

A    I'm sure I did.  I'm sure I stood up because I always try to when a woman comes into the room, and I believe that she stood there and I stood there, although I might have sat back down.  And I asked her, you know, how her summer was coming and how Dwight was, and had she spent a lot of time down at her river house because I knew that they had a house on the Pamunkey River.

Q    All right.

A    And she said, how about you?  And I said, it's been pretty good, my father-in-law passed away in May.  And I think I said my wife was getting ready to or had already tried to sell her father's house at the river. I do recall we had a general conversation about the summer and with her  house and my wife's house.

Q    All right.  Did you make any other statements to Brenda prior to your initiating the wire transfer besides what you've already testified to?

A    Not that I can recall.  I'm sure I did, but I don't recall any others.

Q    Was there any discussion with Wanda regarding the deposit by you?

A    What I recall is that she signed the form while we were still in Brenda's office, and Brenda had already signed it after I had signed it.  That's my recall.  And I recall her saying, do you have a really good website, or words to that effect, after we had this exchange of conversation about our families.  And I told her I had no website.

Q    Do you know what would have caused her to ask you if you have a website?

A   No, no, I don't.

Q   Did she just ask you out of the blue?

A   I don't know why she asked me.

Q   Did that seem strange to you at the time or odd, unusual?

A   I think there might have been some conversation with Brenda and I about the client being a client overseas. I think that probably is what prompted her, but I would be guessing.  I don't know why she asked me.

Q   So, what conversation did you have with Brenda regarding the client?

A    Well, she and I had talked about what the instructions were, where the client was, and I told her. And so, we had some –

Q   What did you tell her?

A   I don't remember except that it was a client from overseas.

Q   What did she ask you?

A   I don't recall.

Q   Did she ask you anything about the check that was deposited?

A   Ask me anything about it?

Q   Yes.

A    She confirmed after she said, let me check, that she could do the wire transfer.  And then she started typing the form.  That's what I recall.  I don't think she said anything about the deposit.

Q    Okay.  Did you describe the deposit to her, what was deposited?

A    I don't think we had any conversation about the deposit that I can recall.

Q   Okay.

A    Because I didn't make the deposit and didn't know the details of the deposit.  I know that's for sure.  But I don't recall she and I talking about the deposit.

Q    Does she, do you know whether or not she, prior to her preparing the wire form or at any time, knew that you had deposited a check?

A    I don't know.  <u>I know that I had told her that I was wiring money that had been placed into my trust account. Now, whether I said it was by check, I can't recall.</u>  (emphasis added)

Q    Okay.  And would you have had any discussion with Wanda

about the deposit, what was deposited, whether it was by check or whatever?

A   I think I've pretty much stated all I can recall about my conversation with Wanda that day.

Q   Okay.  Do you recall either Wanda or Brenda making any comments to you about the deposit or the check that was deposited?

A   They didn't that I can recall.

Q   All right.  How long did Wanda stay in the office?

A   I think at the time very few seconds or a minute. I mean, I remember she came in, we talked.  I was standing, she was standing.  Brenda indicated to her that she needed her to sign the form authorizing the transfer.  I recall that she already knew that. Now, how she knew that, I don't know.  She came into the office and looked, it appeared to me, knowing why she was coming into the office.  I don't think she was coming into the office to say hi to me.  Not that she wouldn't have, but I don't think that was her purpose.  I think she knew what she was doing.  And then as she signed it, they made a copy, I believe Brenda made a copy of the front and back of what I had signed, and we were walking out together, Wanda and I were walking out together.

Q   And then you left the branch?

A   I think I had some conversation with Lisa and another teller just to say, you know, basically hello, you know, nice to see you, or something like that.  There's an older, and I hate to say that because then she'll see this, but there's an older teller that has gray hair that I don't know her name, and then there was Lisa.  Those were the two tellers that I routinely made deposits with.  And I remember saying something on the way out, you know, how are you all doing, or, good to see you, thanks for whatever, and I left.

Q   Okay.  Did you have any conversation with Brenda or Wanda after you left Brenda's office regarding either the deposit transaction or the wire that you can recall?

A   No, I didn't, I didn't have any conversation with either of them. I don't think Brenda came out of the office, frankly.  I remember Wanda did as I walked towards the door.  But certainly Brenda gave me every indication that there was no problem at all.

Exhibit B, Witmeyer's Deposition Transcript, pp. 57:16-70:24.

Taken in the light most favorable to Witmeyer, his experience at BB&T when he issued the payment order to BECALM, does not show the bank told him anything about the deposit of June 3, 2010.  In fact, Witmeyer testified that when he was at the bank to authorize the wire, he

stated he told Brenda Street "that I was wiring money that had been placed into my trust account. Now, whether I said it was by check, I can't recall." *Id*. p. 69:6-8 (emphasis added).  BB&T never told Witmeyer the check had cleared Citibank or was paid by Citibank or anything whatsoever.

In her deposition, Brenda Street, the BB&T employee who received Witmeyer's written payment order testified:

> Q. Okay. Now, you referenced a discussion with Mr. Witmeyer on June 4th, I believe you said in your office –
> A. Uh-huh.
> Q. -- is that right?
> A. Uh-huh.
> Q. Okay. And tell me what was said during that conversation.
> A. Okay. When he came in to do the wire, he said he needed to do a wire, and I said, "Okay." He said, "The funds are in my IOLTA account." So I proceeded to pull up the account to get the account number, and see the available balance. And I believe that's when Wanda came in and spoke to him. They were friends. And she asked him how things were going, and he said, "Things are going great. I'm getting business from the internet from people I don't know, so I'm doing really well."
> . . .
> Q. Tell me what your understanding is of the procedures you follow when you're doing a wire transfer for a customer.
> A. We make sure the client is a signer on the account. We make sure the account has the available funds. We get all the necessary information.

Exhibit D, Street's Deposition Transcript, pp. 10:17-11:9 and 13:9-14.

Notwithstanding BB&T did not owe a duty to Witmeyer, as previously discussed, BB&T did not tell Witmeyer the check cleared.  Brenda Street was focused on whether there were available funds.  Pursuant to VA. CODE ANN. § 8.4A-403(a)(3), "If the receiving bank debits an account of the sender with the receiving bank, payment occurs when the debit is made to the extent the debit is covered by a withdrawable credit balance in the account."  (emphasis added). According to Witmeyer, "Ms. Hassler . . . testified that the only factor she considered to decide

whether to authorize the wire for Witmeyer was whether the funds were 'available', by which

she meant that "the client had provisional credit for that amount of money." (Memorandum in

Opposition to Motion for Summary Judgment, Doc. 15, p. 14). That is all she was required to

address. *See* VA. CODE ANN. § 8.4A-103(a)(1)(ii) ("the receiving bank is to be reimbursed by

debiting an account of, or otherwise receiving payment from, the sender").

### D. **Case law cited by Witmeyer is inapplicable.**

#### a. **Cited cases do not support a constructive fraud claim or an equitable estoppel defense.**

Witmeyer cites the following cases to support his counterclaim against BB&T for

constructive fraud, breach of fiduciary duty or conversion and his estoppel defense against

BB&T's claims. We will address their inapplicability one by one.

##### i. *J. P. Morgan Chase Bank, N.A. v. MAL Corp.*, 2009 U.S. Dist. LEXIS 23540 (N.D. Ill. 2009)

In *J.P. Morgan Chase Bank, N.A. v. MAL Corp.*, on December 4, 2006, Levenfeld,

President of MAL Corporation ("MAL"), presented a check payable to MAL in the amount of

$375,890.00 to Chase for deposit. *J.P. Morgan Chase Bank, N.A. v. MAL Corp.*, 2009 U.S. Dist.

LEXIS 23540, *2 (N.D. Ill. Mar. 26, 2009). The Check was originated by an entity that had

contacted Leventhal through an unsolicited e-mail asking for assistance in facilitating an

international transfer of funds. *Id.* On December 5, 2006, Chase made the proceeds of the

deposited funds available for withdrawal and on that same day Levenfeld authorized a payment

order in MAL's name. *Id.* On December 11, 2006, the Check was returned unpaid as

unauthorized. *Id.* Chase charged back the amount of the Check to MAL's account and filed a

complaint against MAL. *Id.* at 3. MAL alleged seven affirmative defenses in it's answer to the

complaint, including the affirmative defense of estoppel. *Id.* Chase filed a Motion to Strike

MAL Corporation's Affirmative Defenses. *Id*. Chase argued that the Illinois Fiduciary Obligations Act controlled its required actions but the Court was unpersuaded, stating there is no reason a bank's actions could not satisfy both requirements of the FOA and the UCC. *Id*. at *9-10. The Court went on to address the remaining issues in Chase's Motion to Strike. Limiting them to the case at bar, Witmeyer cites to the Court's refusal to strike MAL's defense of estoppel. The *J.P. Morgan* Court recognized that the defense of estoppel "is premised on a showing of intentional deception or gross negligence amounting to constructive fraud . . . [that] requires a recitation of adequate factual underpinnings for consideration of the applicability of the doctrine." *Id*. at *16. The Court denied the motion with respect to the estoppel defense finding that "[o]nce the record has been fully-developed, Chase is free to argue that the doctrine of equitable estoppel should not be applied in this case." *Id*. at *17. Reliance on this case is questionable mainly because the court apparently either was not asked to address or failed to address the provision in UCC 4A-212 that a receiving bank does not owe a duty to the sender.

Moreover, the record in this case fails to show an intentional deception by BB&T amounting to constructive fraud. In fact, there is no credible evidence that when Witmeyer was at the Bank to make the funds transfer payment order that anyone at BB&T told him that the deposit of the Citibank check the day before had been finally paid by Citibank – or for that matter "that the check had cleared." *MAL Corp* has no application.

### ii. *First Nat'l Bank of Denver v. Ulibarri*, 38 Colo. App. 428, 557 P.2d 1221 (Colo. App. 1976)

In *First Nat'l Bank of Denver v. Ulibarri*, 557 P.2d 1221 (Ct. App. 1976) Ulibarri asked the bank whether the payor bank had paid the check and the bank gave assurance it was paid. *Id*. The check was subsequently returned because the account was closed. *Ulibarri* was not a case involving a warranty by Ulibarri that the account was not closed. There is no such warranty in

the UCC.  The check was still a negotiable instrument, it just had no value.  *See* U.C.C. 3-104.

Here, the transfer by Witmeyer was of a fictitious or counterfeit item and it was Witmeyer who

expressly represented it was authentic, which BB&T relied upon.  The misrepresentation was by

Witmeyer that set the transactions in motion.  For that reason, *Ulibarri* is distinguishable.  In any

event, if this case had involved an authentic item returned for insufficient funds, *Ulibarri* is

highly questionable.  As the Court in *Avanta* recognized, *Ulibarri* represents a minority position

and the development of the law in the years since has been to the contrary.  *See Avanta Fed.*

*Credit Union v. Shupak*, 223 P.3d 863, 871-72 (MT 2009).

### iii. *First Georgia Bank v. Webster*, 168 Ga. App. 307, 308 S.E.2d 579 (1983)

In *First Georgia Bank v. Webster*, 168 Ga. App. 307, 308 S.E 2d 579 (1983), there again

a statement was made by the bank employee that the check was "good."  Like, *Ulibarri, Webster*

involved an insufficient funds check. The issue of displacement was not raised in those cases;

they did not address UCC § 4-202 with its express limitation to a collecting bank's duty of

ordinary care, and they did not address that with a counterfeit returned item, it was the

transferor/customer who made the material misrepresentation.  In our case, the check was an

official check.  The Official Comment No. 1 of VA. CODE ANN. § 8.4-212 explains:

"Statistically, this practice of settling provisionally first and then awaiting final payment is

justified because the vast majority of such cash items are finally paid, with the result that in this

great preponderance of cases it becomes unnecessary for the banks making the provisional

settlements to make any further entries."  Like *Ulibarri*, *Avanta* recognized the unpersuasiveness

of *Webster*. *See Avanta*, 223 P.3d at 871-72.

### iv. *Holcomb v. Wells Fargo Bank, N.A.*, 155 Cal. App. 4th 490, 66 Cal. Rptr. 3d 142 (2007)

In *Holcomb v. Wells Fargo Bank, N.A.*, 155 Cal. App. 4th 490 (2007) the customer deposited a $10,000 check into his Wells Fargo business checking account that he had issued from his personal account at U.S. Bank.  *Id*. at 493.  Four days later Holcomb received a call from the Wells Fargo branch manager who stated that the funds had been verified and that he could begin using the $10,000.00, though, Wells Fargo had notice that the deposited item was being returned for insufficient funds.  *Id*. at 494.  The trial court dismissed the claim for failure to state a cause of action.  The appellate court concluded that the customer's complaint adequately stated a cause of action for negligent misrepresentation because it alleged the branch manager had assured the customer he could write checks against his deposit, despite knowing the deposited check had been dishonored. *Id*. at 499.  (emphasis added).  In reversing the trial court, the *Holcomb* court stated that it reviewed 120 or so sections of the UCC, "but we have been unable to locate a specific section providing that a depositor, by presenting a check for payment, warrants there are sufficient funds in the payor bank to cover the item.  Unearthing no authority to support this argument, we cannot consider it further."  *Id*. at 500.  Thus, if the *Holcomb* court had found a warranty by the depositor, transferor that the instrument had value, it is reasonable to conclude the court would have affirmed the trial court in dismissing the common law claim.  The reason being that the UCC displaced a common law claim upon the UCC provision that the warranty of value would have first come from the depositor, transferor to the bank.  Here, Witmeyer's check was returned because the signatures were not authentic; the item was not authorized; it was a counterfeit item.  It was not returned for insufficient funds.  And, here, by transferring the Citibank check to BB&T, Witmeyer warranted that "all signatures on the item are authentic and authorized." *See* VA. CODE ANN. §§ 8.3A-416A and 8.4-207.1 ("Transfer Warranties").  Therefore, extending the reasoning in Holcomb, there is no common law claim

where the item is returned as counterfeit because it was the depositor, transferor who first

warranted the item as authentic.  Pointedly, the *Holcomb* court went on to state, "[w]e caution,

however, that a <u>bank</u> <u>should</u> <u>not</u> <u>incur</u> <u>liability</u> <u>for</u> <u>simply</u> <u>telling</u> a <u>depositor</u> <u>that</u> <u>he</u> <u>or</u> <u>she</u> <u>may</u>

<u>write</u> <u>checks</u> <u>against</u> <u>deposited</u> <u>funds</u> <u>where</u> <u>the</u> <u>depository</u> <u>bank</u> <u>has</u> <u>granted</u> <u>the</u> <u>depositor</u> <u>a</u>

<u>provisional</u> <u>settlement</u> <u>and</u> <u>not</u> <u>yet</u> <u>received</u> <u>notice</u> <u>of</u> <u>dishonor</u> <u>from</u> <u>the</u> <u>payor</u> <u>or</u> <u>intermediary</u>

<u>bank</u>." *Id.* (emphasis added).

> **b.    Cited cases by Witmeyer do not support a constructive fraud claim or an equitable estoppel defense.**

Witmeyer cites the following cases to support his counterclaims against BB&T for breach

of fiduciary duty and conversion.  We will address their inapplicability one by one.

> **i.    *Jones v. Sovran Bank, N.A.* (In re: Nat Warren Contracting, Inc.), 905 F.2d 716 (4th Cir. 1990)**

Witmeyer cites *Jones v. Sovran Bank, N.A.,* 905 F. 2d 716 (4th Cir. 1990) for the

proposition that funds in a special account do not become the property of the bank so that a

special account is equivalent to a bailment.  In *Jones*, Sovran Bank exercised a right of off-set for

an obligation unrelated to the deposit of an item that its customer Nat Warren owed to it.  The

obligation was not related to the special account.  In our case, VA. CODE ANN. § 8.4-212

expressly permitted the charge-back to Witmeyer's IOLTA account that had received the

provisional settlement.

> **ii.   *First Nat'l Bank v. Commercial Bank & Trust Co.*, 163 Va. 162, 175 S.E. 775 (1934)**

*First National Bank v. Commercial Bank & Trust Co.*, 163 Va. 162 (1934), involved a

bank, Commercial Bank & Trust Co., being appointed committee, along with two bank officers,

of an Estate.  *Id.* at 166.  When funds came into the hands of the committees they were

effectively commingled with Commercial Bank's general funds, having been placed in general

deposit.  *Id*. at 169.  The Court held that such funds actually remain in the *cestui que trust* and therefore did not pass to the bank.  *Id*. There is no correlation with the case at bar.  Pursuant to VA. CODE ANN. § 8.4-212(a), BB&T by law, was authorized to "charge-back the amount of any credit given for the item to its customer's account."  Witmeyer, not his clients, was BB&T's customer.  *See* VA. CODE. ANN. § 8.4-104(a)(5); *Collins v. First Union Nat'l Bank*, 272 Va. 744, 750 (Va. 2006).

### iii. *Jones v. United States Fidelity & Guaranty Co.*, 165 Va. 349, 182 S.E. 560 (1935)

*Jones v. United States Fidelity & Guaranty Co.*, 165 Va. 349 (1935), has no application. Like *Jones v. Sovran Bank, N.A.,* it involves a bank off setting against a special account for an obligation unrelated to the account.  A fellow by the name of Venable, who was hardly venerable, was the treasurer of Bath County and maintained the treasurer's account at the Bank of Warm Springs.  *Jones*, 165 Va. at 353-54.  He embezzled treasury funds that he replenished mostly from loan proceeds from a promissory note issued by his wife, Mrs. Venable, to the Bank of Warm Springs.  *Id*. at 354. When the note became due, Bank of Warm Springs set-off the amount due against the treasurer account.  *Id*. The Supreme Court held "[c]ertainly the bank, being the fiduciary character of the funds, had no right to accept them in satisfaction of its personal claim against Venable." *Id*. at 355-56.  Again, here, the charge-back, related to the subject account, was permitted as a matter of law.

### iv. *Radin v. Crestar Bank*, 249 Va. 440, 457 S.E.2d 65 (1995) and *Weichert Co. v. First Commercial Bank*, 246 Va. 108, 431 S.E.2d 308 (1993).

*Radin v. Crestar Bank*, 249 Va. 440 (1995), is a case in which Radin, an attorney, alleges that he maintained an escrow account at Crestar and that he issued a check to a client that was subsequently paid by Crestar on a forged indorsement.  *Id*. at 441.  Crestar sought and obtained a

dismissal of the action upon the ground that the client/payee, not the attorney was the proper party to maintain the action; Radin lacked standing. *Id*. at 441-42. The Virginia Supreme Court reversed, citing *Weichert Company of Va. v. First Commercial Bank*, 246 Va. 108 (1993), holding that Radin was the customer of the Bank and sufficiently alleged facts showing standing to sue in his own right as the customer. *Radin,* 249 Va. at 442-43. Citing to *Weichert*, he argued that the Virginia Supreme Court held a bank has a fiduciary duty to a customer regarding amounts on deposit in a customer's clearly delineated escrow account; implying that if a bank acts against an escrow account it must do so within the rubric of a fiduciary duty. As we know, the instant case involves a deposit by Witmeyer to his IOLTA account. In *Weichert* the facts are that a company named Mt. Vernon Realty maintained an escrow account at First Commercial Bank. *Id*. Mt. Vernon defaulted on an obligation (apparently unrelated to the escrow account) and First Commercial exercised its right of set-off. *Id*. Before the bank exercised its right, Weichert purchased Mt. Vernon's assets. *Id*. Weichert filed its action alleging that it had an interest in the escrow account. The Virginia Supreme Court stated: "[r]egardless of whether Weichert ultimately will prevail on any of its theories of recovery, the parties to the litigation are adverse and the issues can be fully developed." *Id*. Contrary to Witmeyer's argument, the Virginia Supreme Court did not find that banks owe a fiduciary duty to the escrow account customer. It is the overwhelming majority view that a bank does not owe a fiduciary duty unless a fiduciary duty was expressly created: "[t]he relation between a bank and a depositor is that of debtor and creditor. The deposit creates an ordinary debt, not a privilege or right of a fiduciary character." *Siver v. Wachovia Bank, N.A.,* 48 Va. Cir. 481, 485 (1999) (*quoting Deal's Adm'r v. Merchants' & Mechanics' Sav. Bank*, 120 Va. 297, 299 (1917)); *Comeaux v. First Union Nat'l Bank*, 55 Va. Cir. 181, 183 (2001) (sustaining a demurrer as to plaintiff's breach of fiduciary duty

claim, since plaintiff "pled facts that only establish a debtor-creditor relationship and nothing more").

For the reasons stated above, none of the case cited by Witmeyer provide him either an estoppel defense or a claim for breach of fiduciary duty or conversion. Witmeyer relies on cases wherein the facts include a bank employee expressly representing to the customer that final payment of the deposited item was made by the payor bank.  None of those cases apply to this case: (a) there is nothing in this record showing that any BB&T employee expressly represented there had been a final payment of the deposited Citibank check; (b) this record instead shows as a matter of law that Citibank would have had until, no sooner than, June 5, 2010 to make a final payment or, send notice of dishonor; and (c) in this case, unlike the cited cases, Witmeyer had, in hand, an express written notification by BB&T that "All items are credited subject to payment." *See* Exhibit E, Transaction Receipt.

It is important to point out that cases standing for the proposition that a UCC § 3A-416 or 8.4-207.1 transferor may have a claim for negligent misrepresentation when a depositary or collecting bank clearly represents that the payor bank made final payment on the check, fail to address the entirety of the UCC statutory scheme.  If that statutory scheme is fully understood, those cases lose persuasive value.

E.  *Hughes, MAL, Ulibarri* and *Webster*, etc. should be rejected as not well reasoned

A purpose of the UCC statutory scheme is the quick processing of checks. *See Haddad's of Illinois v. Credit Union 1 Credit Union*, 286 Ill. App. 3d 1069, 1075 (Ill. App. Ct. 4th Dist. 1997)("The use of negotiable instruments was intended to facilitate the rapid flow of commerce.").  The use of a provisional credit (§ 8.4-201(a)), charge-backs (§ 8.4-214), and the

midnight deadline to pay or return an item (§ 8.4-302) all serve that purpose.  If a depositor of an item that is not drawn on the depositary or collecting bank can construe a statement by the depositary or collecting bank that final payment of the check was made by the payor bank, the result will be less depositary banks providing provisional credit, thereby countering a central purpose of the UCC statutory scheme: "the rapid flow of commerce."  A circumstance of "he said, she said" can only impair the intended swiftness of negotiable instruments flowing through the financial system.  The proper approach and the one wholly consistent with the statutory scheme is, for the payee of the item to inquire at the payor bank, not the depositary or collecting bank, as to whether a check drawn on an account at the payor bank has been paid by that bank.  After all, a depositary or collecting bank cannot pay another bank's item.  *See* VA. CODE ANN. §§ 8.4-401 and 8.4-104(a)(5).

Moreover, the provisions of the UCC governing depositary and collection banks further support a rejection of those cases.  A statement by a depositary or collecting bank that final payment on a deposited item drawn on another bank cannot give rise to an equitable estoppel defense or cause of action.  BB&T addressed this point in its Motion for Summary Judgment and its Rebuttal Memo.  *See* (BB&T's Motion for Summary Judgment, Document 11, pp. 24-25 and BB&T's Rebuttal Memo, Document 16, p. 11).

It appears that the rulings permitting a claim cite to UCC § 4-212(d):

> The right to charge-back is not affected by:
> (1) previous use of a credit given for the item; or
> (2) failure by any bank to exercise ordinary care with respect to the
>     item but any bank so failing remains liable.

Particular importance appears to the qualifying language: "but any bank so failing remains liable."  Remains liable for what?  To answer this question, we focus on the language being

qualified.  If a bank fails "to exercise ordinary care with respect to the item" it could remain liable to the transferor of the item.  Ordinary care is UCC specific and defined as follows:

> "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this title or Title 8.4.

VA. CODE ANN. § 8.3A-103; *see also* VA. CODE ANN. § 8.4-104.

With respect to the item, does the UCC provide circumstances for the depositary or collecting bank to exercise ordinary care?  If it does, can a court expand on those statutorily limited circumstances?  If the court cannot expand on them, the court must therefore recognize the limits to when "any bank so failing [to exercise ordinary care] remains liable."  The UCC provides limited circumstances when a depositary or collecting bank must "exercise ordinary care with respect to the item".  VA. CODE ANN. § 8.4-202, provides:

> A collecting bank must exercise ordinary care in:
>
> (1) presenting an item or sending it for presentment;
>
> (2) sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be;
>
> (3) settling for an item when the bank receives final settlement; and
>
> (4) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.
>
> (b) A collecting bank exercises ordinary care under subsection (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably

> longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.
>
> (c) Subject to subsection (a) (1), a bank is not liable for the insolvency, neglect, misconduct, mistake or default of another bank or person or for loss or destruction of an item in the possession of others or in transit.

By limiting the circumstances upon which a depositary or collecting bank must exercise ordinary care, the Virginia General Assembly did not include a communication by a depositary or collecting bank that the item for which provisional credit was provided has cleared.  Having not done so, it is not for the court to legislate.

In concluding this reply brief, it is worth noting a statement Witmeyer made in his affidavit. "No one at BB&T indicated to me that BB&T was giving me 'provisional credit' or 'provisional settlement' for the amount of the Check.  If I had been informed that BB&T was making such a 'provisional settlement' I would not have completed the wire transfer because the Check was being deposited into my Trust Account."  Exhibit A, Affidavit of Witmeyer, ¶ 9.  Witmeyer's defense and his claims fail upon that admission alone, notwithstanding the numerous other reasons discussed above.  The record clearly shows that at the time of deposit BB&T provided a transaction receipt that informed Witmeyer the credit he received was provisional and as a matter of law Witmeyer knew the credit was provisional until final payment was actually made.  Witmeyer knew he should not have issued the payment order.  Witmeyer issued the payment order and the deposited item was returned by Citibank within the midnight deadline, to-wit: by June 5, 2009.  BB&T was well within its right to charge-back the IOLTA account and, thus, did not convert any property.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Summary Judgment.

Branch Banking and Trust Company
By Counsel


By:    /s/ Daniel S. Fiore
    Daniel S. Fiore, Esquire
    Virginia Bar No. 020774
    FIORE & LEVINE, PLLC
    5311 Lee Highway
    Arlington, Virginia  22207
    Telephone: (703) 525-2668
    Facsimile: (703) 525-8393
    daniel.fiore@fiorelevine.com
    *Counsel for Branch Banking and Trust Company*


## CERTIFICATE OF SERVICE

I hereby certify that Branch Banking and Trust Company's Reply in Opposition to Witmeyer's Motion for Summary Judgment, was served electronically on November 24, 2010 using the Court's CM/ECF system and by electronic mail, upon David D. Hopper, Esquire, COOK, HEYWARD, LEE, HOPPER & FEEHAN, P.C., Counsel for Defendant, 4551 Cox Road, Suite 210, P.O. Box 3059, Glen Allen, Virginia 23058-3059.

/s/ Daniel S. Fiore
Daniel S. Fiore, Esquire
Virginia Bar No. 020774
FIORE & LEVINE, PLLC
5311 Lee Highway
Arlington, Virginia  22207
Telephone: (703) 525-2668
Facsimile: (703) 525-8393
daniel.fiore@fiorelevine.com
*Counsel for Branch Banking
        and Trust Company*